429 So.2d 194 (1983)
In the Matter of the SUCCESSION OF Daniel HAWKINS, Jr.
No. 82 CA 0509.
Court of Appeal of Louisiana, First Circuit.
February 22, 1983.
Rehearing Denied April 19, 1983.
Samuel C. Cashio, Maringouin, for plaintiff-appellant Manuel Scott.
William C. Dupont of Dupont, Dupont & Dupont, Ltd., Plaquemine, for defendant-appellee Burnette Hawkins.
Before EDWARDS, WATKINS and SHORTESS, JJ.
SHORTESS, Judge.
On December 6, 1980, Daniel Hawkins, Jr. (Hawkins) died in Iberville Parish. He had eleven brothers and sisters, some of whom predeceased him. On March 19, 1975, he made a will which bequeathed a particular legacy to his brother Burnette Hawkins and gave the remainder of his estate to his legal heirs, to be divided equally among them.
On December 18, 1980, Manuel J. Scott (plaintiff) filed a "Petition for Notice of Application for Appointment As Administrator under Articles 3091 to 3094, inclusive, of Code of Civil Procedure." On December 23, 1980, plaintiff filed another petition entitled, "Petition for Order to Search for Will." On August 14, 1981, Burnette Hawkins (defendant) filed a petition to probate the aforesaid will. An order probating a nuncupative testament by private act dated March 19, 1975, was signed on September 2, 1981. On the same date, Burnette Hawkins was confirmed as testamentary executor. On October 2, 1981, defendant filed a motion directing plaintiff to show cause why *195 the affidavit of death and heirship, filed the same date, should not be accepted, and the heirs enumerated in said affidavit confirmed as the only heirs of the deceased. The affidavit stated that Hawkins had never been married and did not have any children. In response to this motion, plaintiff filed an answer and reconventional demand on November 12, 1981, seeking to prove his filiation under Articles 208 and 209 of the Civil Code. Defendant then filed an exception of prescription to plaintiff's petition for filiation.
The trial judge referred the exception of prescription to the merits. After a full trial on the merits, he sustained the exception. In written reasons he stated:
"Certainly the filiation proceeding was filed more than six months after Daniel Hawkins, Jr. died at which time Emmanuel (sic) Scott was forty-four years of age. It was also filed more than one year after the effective date of Act 549 of 1980 and rights had vested prior to the effective date of Act 720 of 1981."
Nineteen witnesses testified at trial. Their testimony reveals that Hawkins was never married and thus never had any legitimate children. He lived with Leola Woolfolk for over thirty years, with whom he had no children. None of the witnesses ever knew Hawkins to live with Louise "Lola" Scott, plaintiff's mother. However, Hawkins lived in the same general area as Lola Scott.
Although plaintiff never went by the last name of Hawkins, all witnesses stated that plaintiff worked with Hawkins all of his life and that the two were together very often. Plaintiff did farm work for Hawkins such as hauling cotton and sugarcane, breaking corn, and taking care of the hogs. When Hawkins' hogs got out of their pen, plaintiff was called to put them back in. Although other boys worked for Hawkins, plaintiff was given greater responsibility than the other boys as evidenced by the fact that only he collected the rent, gave receipts, and did repair work on Hawkins' rental property.
No one denied the fact that plaintiff visited Hawkins at home and in the hospital when he was sick. Plaintiff testified that when he could not stay with him at night because he had worked "dogs", he paid his stepfather, Theodore LeBlanc, twenty dollars to stay overnight to care for Hawkins.
Several witnesses testified that Hawkins and plaintiff looked alike. Their hands, height and color were similar. They were both bald-headed. Although some witnesses testified that they had heard that Emmanuel Crump was plaintiff's father, these witnesses admitted an interest in the outcome of the case. For example, Louise Hawkins Butler stated that she was an heir of her brother and was not willing to give plaintiff his share as a son. In contrast, approximately nine disinterested witnesses testified that the general feeling in the community was that Hawkins was plaintiff's father.
Six disinterested witnesses testified that Hawkins told them that plaintiff was his son. Aldrich Dupree testified that Hawkins told him, "Yeah, well, I told you, that's my son." He additionally stated that Hawkins showed particular affection to plaintiff, permitting him use of his car to go out after filling it with gas.
Mike Oliver stated that he and Hawkins were friends and used to go out together. He was aware of the fact that Hawkins used to visit Lola Scott. He testified that Hawkins told him that he had "messed up" because Lola Scott was pregnant, and that Hawkins asked him what he was going to do about it. He further stated that Hawkins told him that he paid the expenses of having the baby. Oliver stated that Hawkins treated plaintiff like a son and that he disciplined him when he was bad.
Mary Eva Louden, Hawkins' aunt, stated that he told her, "You know, Auntie, he's mine." Ernest Hall testified that he had heard other people say that plaintiff was Hawkins' son but that he didn't "go by what I hear but by what he [Hawkins] told me." Hawkins had told him that Manuel was his son.
*196 Howard Jackson testified that Hawkins told him more than once that plaintiff was his son. He further stated that Hawkins refused to sell him a truck, stating that he had given it to plaintiff, whom he referred to as "that boy of mine." Hawkins told Jackson that he used to go out with Lola Scott, plaintiff's mother.
Abraham Hill testified that he had "heard in the wind" that Hawkins was plaintiff's father but that he did not know for sure until Hawkins told him. He said Hawkins told him the reason he did not go around saying that plaintiff was his son was because he did not want any confusion with Leola Woolfolk, with whom he was living. Leola Woolfolk testified that although Hawkins never told her plaintiff was his son, she knew it all along; that plaintiff visited with them every day of his life; that "everywhere we went we would carry this boy;" that plaintiff would get the key to Hawkins' car from him and would take the car out on dates; that Hawkins signed for plaintiff's drivers license; and that many people told her that Hawkins was plaintiff's father.
Lola Scott, plaintiff's mother, testified that at the moment she learned she was pregnant, she knew that Hawkins was the father because he was the only one that she was going out with at the time; that when she told him, he did not deny it, but rather gave her $100.00 for her living expenses while she was at Charity Hospital in New Orleans. He gave her money and food when she returned and came to see plaintiff every day and even changed his diapers.
Plaintiff testified that Hawkins told him on several occasions that he was his father; that he worked for him about 36 years and was never paid a regular salary; that he did so because he thought he was his son and "he hated to see the work that he had ahead of him and didn't have enough help to take care of it;" and that he loved Hawkins like a father and felt that Hawkins loved him like a son.
Plaintiff assigned five specifications of error. We believe that specifications one and two have merit and are dispositive of the case so pretermit discussion of the other specifications:
1. The trial court erroneously sustained the exception of prescription after concluding that the rights of Hawkins' brother and sisters vested at the end of the time period specified in Act 549 of 1980, thus barring plaintiff's right to file a filiation proceeding.
2. The trial court erroneously concluded that the additional time period set forth in Act 720 in 1981 in which plaintiff could bring a filiation suit was totally without effect.
In 1980, the Legislature passed Act 549 which established a procedure for proving the filiation of an illegitimate child. Act 549 amended C.C. Arts. 208 and 209. In 1981, these articles were again amended by Act 720. Both acts specify time limitations within which a proceeding to establish filiation must be brought, as well as grace periods of one year from the effective dates of the respective acts. Act 549 provided in pertinent part:
"A civil proceeding to establish filiation must be brought within six months after the death of the alleged parent, or within nineteen years of the illegitimate child's birth, whichever occurs first.
"Any illegitimate child nineteen years of age or older shall have one year from the effective date of this Act to bring a civil proceeding to establish filiation under the provisions of this Act and if no such proceeding is instituted within such time, the claim of such an illegitimate child shall be forever barred."
Act 720 provided in pertinent part:
"The proceeding required by this Article [proof of filiation] must be brought within one year of the death of the alleged parent or within nineteen years of the child's birth, whichever first occurs. This time limitation shall run against all persons, including minors and interdicts. If the proceeding is not timely instituted, the child may not thereafter establish his filiation.

*197 "Any person against whom the time period provided in this Act would otherwise have accrued except for the provisions of this Section shall have one year from its effective date to bring a proceeding to establish filiation of a child. If no such proceeding is timely instituted, such filiation may not thereafter be established."
The effective date of Act 549 was July 23, 1980. Thus, illegitimate children over nineteen years of age had to institute suit to establish filiation by July 23, 1981, or were forever barred. The effective date of Act 720 was September 11, 1981. It gave illegitimate children whose right to institute an action to establish filiation had expired on July 23, 1981, an additional year (until September 11, 1982) in which to institute such a proceeding. The Supreme Court in Succession of Clivens, No. 82-C-0125, slip op. at 13 (Supreme Court of Louisiana, January 10, 1983) stated:
"The Legislature granted a second grace period in Act No. 720 of 1981 because of the inadequacies present in the grace period provision of Act No. 549 which, perhaps, threatened the constitutionality of the entire statute."
Defendant argues, and the trial court in effect held, that his and his siblings' inheritance rights vested on July 23, 1981, because at that time plaintiff had not filed a filiation action. He says that once their rights vested, Act 720 could not divest them. The argument is interesting, and the issue has been raised in a scholarly law review article.[1] However, since that article was written, Succession of Clivens, supra, has answered the question once and for all. Therein, the Supreme Court forcefully and unequivocably interpreted Act No. 720 of 1981 as it amended La.C.C. Art. 209 to mean that unacknowledged illegitimate children had until September 11, 1982, to file a filiation action[2] in order to take advantage of the retroactive application which they had given to Succession of Brown, 388 So.2d 1151 (La.1980), cert. denied, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).
In the instant case, plaintiff filed a proceeding to establish his filiation on November 12, 1981. That is all Clivens, supra, requires, i.e., the filing of a "... lawsuit asserting his filiation on or prior to September 11, 1982," slip op. at 9. Thus, plaintiff's claim had not prescribed, and the exception of prescription should have been overruled.
The purpose and effect of recent jurisprudence is to give illegitimates rights that had previously been denied them. The Supreme Court recognized in Clivens the problems inherent in retroactively giving illegitimates rights. In the final analysis, the constitutional rights of illegitimates must be weighed against inequities which might result from affording them a heritable interest. In reaching a decision to apply Brown, supra, retroactively, the Supreme Court stated that the instances in which land titles are likely to be adversely affected have been minimized by legislative action.
The trial judge erred legally in sustaining the exception of prescription; but since he had referred the exception to the merits and heard the entire case on the merits, we must decide whether or not plaintiff proved his filiation by a preponderance of the evidence.[3]
The record reveals that the general consensus in the community was that plaintiff was Hawkins' son. Although some testimony to the contrary was presented, it came from interested parties. Most of the disinterested witnesses testified that not only *198 had they heard in the community that plaintiff was Hawkins' son, but that Hawkins himself had told them that he was plaintiff's father. The record also reveals that a father-son relationship existed between them. Plaintiff worked for Hawkins without a regular salary. Hawkins showed particular affection and trust for plaintiff, and even disciplined him when he was bad. Hawkins gave plaintiff's mother money when she went to New Orleans to have plaintiff and continued to give money and food to her after plaintiff was born.
We find that plaintiff proved his filiation to Hawkins. The judgment sustaining the exception of prescription is reversed and there is judgment herein recognizing Manuel J. Scott as the child and a legal heir of Daniel Hawkins, Jr. All costs of this appeal are taxed to defendant, the testamentary executor.
REVERSED AND RENDERED.
NOTES
[1] Spaht, Establishing the Filiation of Illegitimate Children, 42 La.Law Review 403 (1982).
[2] Of course, C.C. Art. 203 continued to provide a vehicle for formal acknowledgment, without the necessity of a filiation action for certain illegitimates.
[3] The preponderance of evidence rule was in effect throughout these proceedings. We do note, however, that C.C. Art. 209 was again amended in 1982, which altered the burden of proof standard. Now, if the alleged parent is deceased, the clear and convincing burden of proof would be applicable.